# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **VS.** | : | **CRIMINAL NO. 01-cr-05-04** |
| | : | |
| **GARY RAMSEY** | : | |

## PROPOSED ORDER

AND NOW, on this      day of         , 2020, upon consideration of the Defendant's Motion for Compassionate Release/Sentence Reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), it is hereby **ORDERED AND DECREED** that the Defendant's relief is **GRANTED**. Accordingly, the Defendant's sentence is reduced as follows: _____. The Defendant is to be released from the custody of the Bureau of Prisons **FORTHWITH**.

(*Alternatively,* The remainder of Defendant's sentence is permitted to be served on home confinement with immediate release from the custody of the United States Marshals.)

BY THE COURT:

_____
Paul S. Diamond, Judge
United States District Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | |
| VS. | : | CRIMINAL NO. 01-cr-05-04 |
| | : | |
| GARY RAMSEY | : | |


## DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE/ SENTENCE REDUCTION PURSUANT TO 18 U.S.C. §3582(c)(1)(A)

**TO THE HONORABLE PAUL S. DIAMOND, THE JUDGE OF SAID COURT:**

NOW COMES the Defendant, Gary Ramsey, in the above-captioned matter by his attorney, Carina Laguzzi, Esquire, and hereby respectfully moves this Honorable Court to allow the Defendant a reduction in sentence to be allowed compassionate release. There are several potentially deadly complications if he were to contract COVID-19 again as he continues to receive inadequate medical care for the lasting effects from his first contraction of the disease while in custody with his underlying health conditions. Mr. Ramsey has also showed remarkable rehabilitation efforts and continued cooperation efforts.[1] Mr. Ramsey presents the following in support of the relief sought:


## PROCEDURAL HISTORY

---

[1] Mr. Ramsey is has also prepared a Motion for Reduction of Sentence Pursuant to Rule 35.

1.     In October 9, 2002, the Honorable Court presided over by Judge William H. Yohn sentenced Mr. Ramsey on the above-referenced case.

2.     The sentence was as follows:  360 months to run concurrently on Counts One, Two, and Eleven.  Since his total offense level was 39 and his criminal history category VI, this guideline range was 360 months to life for Count 6, 60 months for Count One, and 300 months for Counts Two and Eleven.  Mr. Ramsey was subject to mandatory consecutive sentences of 120 months for Count Thirteen, 300 months for Count Four, and 120 months for Count Five.  Thus, in spite of being sentenced to the lowest point of the guideline range, the application of the three mandatory consecutive sentences resulted in a sentence of a total of 900 months.

3.     Mr. Ramsey now, after <u>Johnson v. United States</u>, has argued that his convictions no longer qualify as a crime of violence and that he no longer qualifies as a career offender. 576 U.S. (2015).  Also, it is noteworthy that Mr. Ramsey was sentenced pre- <u>Booker</u> and thus did not enjoy the considerations defendants had after <u>Booker</u>, primarily the consideration of the 3553(a) factors[2].  <u>United States v. Booker</u>, 543 U.S. 220 (2005).

4.     Mr. Ramsey has been in custody since March 4, 2001.

5.     To date, Mr. Ramsey has served approximately 19 years and 6 months in custody, or 234 months.

---

[2] Mr. Ramsey's relevant 3553(a) factors are also dis cussed in his companion Motion for Reduction of Sentence Pursuant to Rule 35 in this case.

6.     Mr. Ramsey has stated that he has applied to the Bureau of Prisons ("BOP") for compassionate relief, and that an excess of thirty (30) days have passed without a determination made on the merits.[3]

7.     Accordingly, it is submitted that the Defendant has exhausted his administrative remedies, thereby entitling him to seek judicial intervention.  See 18 USC §3582(c)(1)(A) (providing that a prisoner can file a motion with the Court upon the "lapse of 30 days from the receipt of a request for compassionate release by the warden of the defendant's facility…")[4]


**COVID-19 PANDEMIC**

8.     The initial outbreak of coronavirus disease 2019 (COVID-19), caused by the novel severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), was first reported in December 2019 in Hubei Province, China. Montoya-Barthelemy AG, Lee CD, Cundiff DR, Smith EB. COVID-19 and the Correctional Environment: The American Prison as a Focal Point for Public Health [published online ahead of print, 2020 Apr 17]. *Am J Prev Med*. 2020;S0749-3797(20)30144-6. doi:10.1016/j.amepre.2020.04.001.  It has since been declared a pandemic by the World Health Organization, with an increasing velocity of deaths and diagnoses in

---

[3] Counsel is without any documentation on this subject as Mr. Ramsey has been moved to a state facility in New York.  See Motion for Reduction in Sentence Pursuant to Rule 35 for more information on this.  It has been difficult for counsel to communicate with Mr. Ramsey during his stay in New York.  Counsel has written to Mr. Ramsey requesting this documentation.  As soon as it is received, counsel will file same as an exhibit to supplement this motion.

[4] A prior request to the warden is a procedural prerequisite to obtain relief in court under the RIS statute. See United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020).

the U.S. Id. As of June 4, 2020, COVID-19 has infected nearly 6.5 million people worldwide, leading to more than 380,000 deaths. World Health Organization (WHO), *Coronavirus (COVID-19),* https://covid19.who.int.

9.      Prisoners and correctional staff share an environment known to amplify, accelerate, and act as a reservoir for outbreaks of respiratory disease. American Prison, supra. As a respiratory-borne illness, the rate of transmission is largely dependent upon the extent of respiratory contact between individuals. Id. The novel coronavirus that causes COVID-19 is highly contagious. It spreads from person to person through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects, where the virus can survive for up to three days. People who are asymptomatic or pre-symptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread.

10.      Detention settings are extremely susceptible to rapid and disastrous spread of infectious disease, owing to both environmental and host factors—a point extensively documented by the historical spread of influenza, tuberculosis, and other respiratory pathogens. Id. citing CDC. Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. Accessed March 29, 2020 and Maruschak LM, Sabol WJ, Potter RH, Reid LC, Cramer EW. Pandemic influenza and jail facilities and populations. Am J Public Health. 2009:99 (suppl 2):S339–S344. doi: 10.2105/ajph.2009.175174. Crowding, inadequate ventilation, and security issues

all contribute to the spread of infectious disease in jails and prisons.   Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), [https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators](https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators) .

11.    As of September 2, 2020, the BOP reports it has 126,971 federal inmates in BOP-managed institutions and 13,903 in community-based facilities. The BOP staff complement is approximately 36,000. There are 1,814 federal inmates and 673 BOP staff who have confirmed positive test results for COVID-19 nationwide.    Federal Bureau of Prisons, *Covid-19 Cases*, https://www.bop.gov/coronavirus.   However, as explained below, it is highly plausible these numbers are artificially low.

12.    A comparison of infection rates in BOP facilities as compared with the United States in general shows an alarming disparity:

## COVID-19 Rate of Infection for Various Populations



| Location | Cases | Population | Infections/1,000 People | Infection Rate of Population |
|---|---|---|---|---|
| BOP Imprisoned Pop. | 5,717[5] | 147,919[6] | 38.65 | 3.865% |
| United States | 1,851,530[7] | 329,741,209[8] | 5.62 | 0.5615% |
| China | 84,159[9] | 1,394,015,977[10] | 0.06 | 0.0060% |
| Italy | 233,836[11] | 62,402,659[12] | 3.75 | 0.3747% |

[5] Includes the number of BOP inmates who have tested positive for COVID-19, the number of BOP inmates who have recovered, and the number of BOP inmates who have died from COVID-19. Numbers obtained from ww.bop.gov/coronavirus, May 21, 2020.

[6] Includes the number of federal inmates in BOP-managed institutions, the number of federal inmates in community-based facilities, and the number of federal inmates who have died from COVID-19. Numbers obtained from www.bop.gov/coronavirus, May 21, 2020.

[7] Statistic obtained on 6/3/2020 at 11:00am from https://coronavirus.jhu.edu/map.html.

[8] Statistic obtained on 6/3/2020 at 11:02am from https://www.census.gov/popclock.

[9] Statistic obtained on 6/3/2020 at 11:00am from https://coronavirus.jhu.edu/map.html.

[10] Statistic obtained on 6/3/2020 at 11:02am from https://www.census.gov/popclock.

[11] Statistic obtained on 6/3/2020 at 11:00am from https://coronavirus.jhu.edu/map.html.

[12] Statistic obtained on 6/3/2020 at 11:02am from https://www.census.gov/popclock.

13.    The Court in this district has specifically addressed the pandemic

recently, writing:

> "COVID 19 has radically altered life as we know it…There are over 3.5 million confirmed cases of COVID-19 worldwide, and over 1.5 million confirmed cases in the United States…
> According to a CDC report 'nearly 90" of adult patients hospitalized with COVID-19 in the U.S. had one of more underlying disease, and out of those patients 49.7% of them had hypertension and 28.3% of them had diabetes…" United States v. Michael Pabon, No. 17-cr-165, Pages 1, 3 (Brody, S.J.) (Judge Brody granted compassionate release to a fifty-four year old man suffering from diabetes and hypertension stating that, "the confluence of COVID-19 and Mr. Pabon's health conditions made this circumstance extraordinary and compelling").

14.    The Pabon opinion goes on to state:

> "These statistics become even more concerning in the prison context.  Prisons are tinderboxes for infectious disease.  The question whether the government can protect inmates from COVID-19 is being re-examined everyday as outbreaks continue to emerge and new testing efforts reveal that the rate of infection in man correctional facility is far higher than previously imagine. Id. at 3.

15.    Testing was delayed at federal facilities for several months (thus

facilities were stating they had no positive cases) so the numbers reflected could

arguably be higher as inmates who were sick and recovered but never tested, would

not be included in these numbers.

16.     However, earlier this year Mr. Ramsey was infected with the disease. See Exhibit "A."

17.     Specifically, at the state facility in Rikers Island in New York, where Mr. Ramsey is currently housed, several positive COVID-19 inmates are being housed with previously infected inmates, which increases the chance for reinfection.

18.     Mr. Ramsey continues to feel the effects of the COVID-19 virus manifested as shaking, continued diarrhea and profuse "sweats." He has only been give Tylenol for treatment of these symptoms which have remained unresolved since April.

19.     Visits at federal facilities around the country were suspended in an attempt to reduce the spread of the virus. www.bop.gov/locations/institutions/phl/. However, the Bureau of Prisons has not made changes to protocols that require prisoners to buy their own cleaning supplies. Brown, et al. v. Marler, 20-cv-1914, Page 17.

20.     Beginning approximately April 1, the FDC Philadelphia (like most federal facilities around the country) began a two week lockdown during which inmates endure punitive restrictions including twenty-three (23) hour lockdowns. Id. at Page 27. Cells hold two persons and, at a standard size of approximately 100 square feet, make social distancing impossible. Id. Even under the lockdown imposed, a person will come into close contact with 15-20 other people every day. Id. at Page 28.

## LEGAL ANALYSIS

21.     Pursuant to 18 U.S.C. § 3582(c)(1)(A), a Court may reduce an inmate's sentence if the Court finds (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with applicable policy statements issued by the sentencing commission," and (3) the applicable sentencing factors under § 3355 warrant a reduction.

22.     Specifically, the compassionate release statute, found at 18 U.S.C. §3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides:

> (c) Modification of an Imposed Term of Imprisonment.- The court may not modify a term of imprisonment once it has been imposed except that-
> (1) in any case-
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prison to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that-
>
> (i)     extraordinary and compelling reasons warrant such a reduction…
>
> And that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission…

23.     Furthermore, 28 U.S.C. §994(t) provides:

> "The Commission, in promulgating general policy statements

regarding the sentencing modification provisions in section 3582(c)(1)(A) of Title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."

Accordingly, the relevant policy statement of the Commission is binding on the Court. <u>Dillion v. United States</u>, 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding in the Court).[13]

24. In addition, as amended by the First Step Act, Congress provides a mechanism to modify terms of imprisonment if "extraordinary and compelling reasons warrant such a reduction…and that such reduction is consistent with applicable policy statements issued by the Sentencing Commission…" Section 1B1.1.13 of the Sentencing Guidelines is the only applicable sentencing statement. The policy statement provides that for "extraordinary and compelling reasons," to exist, the Court must find:

25. The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling

---

[13] Prior to the First Step Act being passed, the Commission policy statement was binding on the Court's consideration of a motion under S 3582(c)(1)(A), such a motion could only be presented by the BOP. The First Step Act added authority allowing the inmate to file a motion, after exhausting his/her administrative remedies, or after the passage of 30 days after having presented the request to the warden, whichever is earlier.

circumstances" exist, "after considering the factors set forth in 18 U.S.C. §3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)."

**MEDICAL CONDITIONS - CHRONIC CARE ISSUES**

26.    The first factor of the policy statement in § 1B1.13 is met in this case due to the Defendant's current medical issues.  He has been infected with COVID-19 and continues to have the effects of the disease.

27.    **Deficiencies in the BOP regarding medical care**

An important factor for the Court to consider in this motion is that many inmates with a serious chronic physical illness[14] fail to receive care, much less adequate care, for their disease while incarcerated.  Andrew P. Wilper, MD, MPH, Steffie Woolhandler, MD, MPH, J. Wesley Boyd, MD, PhD, Karen E. Lasser, MD, MPH, Danny McCormick, MD, MPH, David H. Bor, MD, and David U. Himmelstein, MD, *The Health and Health Care of US Prisoners: Results of a Nationwide Survey,* 99(4) AMERICAN JOURNAL OF PUBLIC HEALTH: 666–672 (April 2009). doi: 10.2105/AJPH.2008.144279.  And this is all before the pandemic hit us with a new worry for inmate health.

---

[14] Defined as "any condition likely requiring follow-up medical attention."

28.     A 2008 audit ("audit") by the Office of the Inspector General found that of the BOP institutions tested[15], each one did not always provide recommended preventative health care to inmates. *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care*, U.S. DOJ Office of the Inspector General Audit Report 08-08, February 2008.   (Since that time, the only other audit report ("report") done by the Office of the Inspector General was in September 2019 for the contract awarded to Correct Care Solutions, LLC for comprehensive medical facilities at the Federal Correctional Complex located at Coleman, Florida. https://oig.justice.gov/reports/2019/a1937.pdf [16])

29.     Among federal inmates, 2.1% were missing data on prescription medications at admission and 2.8% on prior diagnosis of PTSD; 6.0% were missing data for HIV testing and 15.8% for duration of incarceration.   Id.   Chronic conditions were common among inmates; 49,702 federal inmates (38.5% [SE = 2.2%])[17] had at least 1 chronic medical condition.   Id.   Among inmates with a persistent medical problem, 13.9% of federal inmates had received no medical examination since incarceration.   Id. Mr. Ramsey's continued prolonged effects after being infected with COVID-19 need to be monitored, especially since new

---

[15] United States Penitentiary (USP) Atlanta (Georgia), USP Lee (Virginia), Federal Medical Center (FMC) Carswell (Texas), Federal Correctional Complex (FCC) Terra Haute (Indiana), and FCC Victorville (California).

[16] The 2019 report was commissioned to oversee the Federal Bureau of Prisons contract value at a little over $65 million dollars awarded to Correct Acre Solutions, LLC in December 2015.  Id. at Page 1.  The report analyzed and made recommendations primarily regarding billing issues rather than actual care issues.  Id. at Page 2.  Indeed, none of the report's recommendations dealt with inmate care.  Id. at Pages 18-19.

[17] Although the article and study cite to state and local jail inmate statistics, these have been omitted from this memorandum as not relevant in this case.

information about this disease is learned daily. Following serious injury, the audit found 650 federal inmates (7.7%) were not seen by medical personnel. <u>Id</u>.

30.     More than 10 percent of the sampled inmates did not receive the medical service. <u>Id</u>. As an example, 94 percent of the inmates who should have received a cardiovascular risk calculation had not received one in the last 5 years, as recommended by BOP guidelines. <u>Id</u>. at viii. This is especially relevant in this case as Mr. Easley suffers from hypertension.

31.     The audit also found federal institutions either did not usually provide, or were inconsistent in providing, 18 of the 30 medical services tested. <u>Id</u>. at ix and 25. For example, the cardiovascular risk calculation was rarely performed in the five institutions tested. <u>Id</u>. at ix and 26. The audit demonstrates there is a disparity in medical service which requires better BOP oversight from headquarters. <u>Id</u>. at ix and 27-32. The audit found that although the BOP corrects deficiencies in the institutions at which deficiencies are found, it generally does not develop and issue agency-wide guidance to correct systemic deficiencies found during internal program reviews. <u>Id</u>. at xiv and 59-60.

32.     Furthermore, the audit results identified that 134 practitioners out of 1,536 (9 percent) who were allowed to provide medical services to BOP inmates without current BOP privileges, practice agreements, or protocols. <u>Id</u>. at xvi and 38-40. BOP officials do not fully understand the type of authorization different health care providers should receive, or ensure that the health care providers have them. <u>Id</u>. at xvii and 47-50. "Allowing practitioners to provide medical care to

inmates without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services." Id. at xvii.

33.    There is an increased medical risk of long term damage to Mr. Ramsey through prolonged incarceration, especially during this pandemic, including death due to the nature of COVID-19 and the fact Mr. Ramsey is not getting the medical care he requires for the effects he is suffering from at the present time.  Accordingly, the Court should consider this as one of the factors in granting the motion.  See 18 U.S.C. § 3553(a)(2)(E).

34.    The second factor in the policy statement for § 1B1.13 provides that a sentence reduction may only be granted if "[t]he defendant is not a danger to the safety of any other person or to the community as provided in 18 USC §3141(g)".  USSG 1B1.13(2).   Mr. Ramsey has showed a tremendous rehabilitation effort through completion of his course work.  See Exhibit "B."

35.    Mr. Ramsey has completed 38 courses amounting to 1,015 hours of study while incarcerated.   The courses included: psychology and self-study, stress/anxiety management, and GED classes.  This coursework has helped him improve this chances at finding employment and dealing with the issues of his past that led him into criminal activity.[18]

---

[18] The details of his childhood abuse are written in the Motion for Reduction of Sentence, Mr. Ramsey has also filed in this case.

36.     Clearly, the BOP is unable to meet the demands as the effects of Mr. Ramsey's COVID-19 disease that he continues to suffer from, and that are not under control.  By allowing him immediate release from custody, Mr. Ramsey could better protect himself against being re-infected with COVID-19 and receive better medical care.

**REHABILTATION EFFORTS**

37.     The Court must also consider the § 3553(a) sentencing factors in considering this motion.  The §3553(a) factors in this case mitigate in favor or a sentence reduction or immediate release to home confinement.  Per Mr. Ramsey's history and characteristics, he has gone a long way to show that he is making efforts at spending his time well.  Mr. Ramsey has completed numerous programs while in custody.  Exhibit "B."

38.     Mr. Ramsey is currently 50 years old.  The United States Sentencing Commission1 began studying recidivism shortly after the enactment of the Sentencing Reform Act of 1984 ("SRA"), and has issued several recent publications examining recidivism rates among federal offenders released in 2005. *The Effects of Aging on Recidivism Among Federal Offenders,* United States Sentencing Commission.  December 2017.  Page 2.  Older offenders were substantially less likely than younger offenders to recidivate following release. Over an eight-year follow-up period, 13.4 percent of offenders age 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger

than age 21 at the time of release. The pattern was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration declined as age increased. Id. at Page 3. For each age grouping shown in the previous report, the older the age group, the lower the rearrest rate. The same pattern held for reconviction and reincarceration rates. Id. at Page 10.

39.    Finally, through gainful employment, Mr. Ramsey would be able to pay back the restitution amount imposed at sentencing at a faster rate than if he remains in custody.

**AVOIDING DISARITIES IN MOTIONS FOR COMPASSIONATE RELIEF**

40.    The BOP has said it is "prioritizing for consideration" inmates who had sever more than half their sentences or had 18 months or less remaining: Yet Paul Manafort, President Donald Trump's former campaign manager who had been convicted of conspiracy to defraud the United States and to obstruct justice related to his undisclosed lobbying for a pro-Russian politician was released from FCI Loretto after serving less than one third of his sentence.[19] https://www.washingtonpost.co/national-security/paul-manafort-granted-home-confinement-due-to-coronavirus-fears/2020/05/13/7746835c-8320-11ea-ae26-989cfce1c7c7_story.html. Manafort was convicted of hiding millions of dollars, violating federal lobbying rules and committing witness tampering during trial. Id. Yet he only served twenty-three (23) months out of a seven and one half year

---

[19] Manafort's release was ordered due to preexisting health conditions such as high blood pressure, liver disease and respiratory ailments. Id.

sentence, well under the threshold outlined in the BOP guidelines. In addition, at the time of Mr. Manafort's release from FCI Loretto, there were no confirmed cases of COVID-19 at that facility.

41.    In 2016, Former United States Reprehensive for Pennsylvania Chaka Fattah was convicted of using more than $600,000 in federal grants and charitable funds and sentenced to ten (10 years in federal prison.) [https://www.foxnews.com/politics/disgraced-former-pa-rep-chaka-fattah-released-from-federal-prison-serving-rest-of-sentence-at-home-or-halfway-house](https://www.foxnews.com/politics/disgraced-former-pa-rep-chaka-fattah-released-from-federal-prison-serving-rest-of-sentence-at-home-or-halfway-house).    Mr. Fattah was released in June 2020. Id.

42.    "The Bureau of Prisons has struggled to implement (Attorney General William) Barr's directive to release inmates to home confinement, issuing shifting guidance that apparently has not been applied uniformly." Id.

43.    As the virus continues to spread and infect staff and detainees, the possibility of containing the virus becomes harder and the risk of death becomes more likely. Each day that passes and COVID-19 continues to infect more inmates and staff, Mr. Ramsey is increasingly fearful for his life. Mr. Ramsey was not sentenced to death, nor was he sentenced to life in prison.


**CONCLUSION**

44.    In sum, consideration of the relevant factors warrants Mr. Ramsey's immediate release to home confinement or a reduction in his sentence that would result in an immediate release from prison. His medical conditions pose extreme

danger to his life if he is exposed to COVID-19.  He has served almost twenty years in prison.

45.    WHEREFORE, Mr. Ramsey requests that this Court grant him the motion for compassionate release (in connection, and consideration of, his Motion for Reduction of Sentence Pursuant to Rule 35) and reduce his sentence such that he is discharged from the custody of the United States Marshalls forthwith, or to home confinement for the remainder of his sentence.

Respectfully submitted:

/s/ Carina Laguzzi
CARINA LAGUZZI, ESQUIRE
Attorney for Defendant
Gary Ramsey

DATED: September 3, 2020

## **CERTIFICATE OF SERVICE**

I, CARINA LAGUZZI, ESQUIRE, certify that on this 3th day of September, 2020, I have served the below referenced parties via electronic filing and electronic correspondence, a true and complete copy of the attached Motion for Compassionate Release pursuant to 18 USC § 3582(c)(1)(A) and Exhibits upon:

Robert Zauzmer
Assistant United States Attorney
bob.zauzmer@usdoj.gov

The Honorable Paul Diamond
U.S. District Court Judge
lenora_kashner_wittje@paed.uscourts.gov

/s/ Carina Laguzzi
CARINA LAGUZZI, ESQUIRE
Attorney for Defendant